**Robert MURPHY and Mary Murphy, Plaintiffs,**

v.

**ZONING COMMISSION OF THE TOWN OF NEW MILFORD, et al, Defendants**

**No. CIV.3:00CV2297(HBF).**

United States District Court, D. Connecticut.

Sept. 30, 2003.

Vincent P. McCarthy, McCarthy Law Offices, New Milford, CT, for Plaintiffs.

Steven E. Byrne, Law Offices of Thomas P. Byrne, Farmington, CT, for Defendants.

John B. Hughes, U.S. Attorney's Office, New Haven, CT, Tamara Ulrich, U.S. Dept. of Justice Civil Division, Federal Programs, Washington, DC, for Intervenor–Defendant.

Howard M. Wood, III, Phelon, Fitzgerald & Wood, Manchester, CT, for Amicus.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

FITZSIMMONS, United States Magistrate Judge.

## I. *INTRODUCTION*

This case involves the very important issue of whether a cease and desist order issued by the defendant Zoning Enforcement Officer ("ZEO"), at the request of the defendant Zoning Commission of the Town of New Milford ("NMZC"), violates plaintiffs' rights under the United States Constitution, the federal Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the Constitution of the State of Connecticut, and/or Connecticut's Act Concerning Religious Freedom ("ACRF"). Also at issue, if they have been violated, is the constitutionality of RLUIPA and ACRF. The parties have filed cross motions for summary judgment on all claims and defenses; and the United States, as intervenor, and The Becket Fund, as *amicus curiae*, have filed briefs in support of RLUIPA's constitutionality. The court has reviewed each of these briefs, as well as the relevant authorities, before arriving at the court's decision.

## II. *STANDARD OF REVIEW*

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and positions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." *Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.) The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). *See also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

In the context of a motion for summary judgment pursuant to Rule 56(c), disputed issues of fact are not material if the moving party would be entitled to judgment as a matter of law even if the disputed issues were resolved in favor of the non-moving party. Such factual disputes, however genuine, are not material, and their presence will not preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Cartier v. Lussier*, 955 F.2d 841, 845 (2d Cir.1992).

When a summary judgment motion is supported by documentary evidence and sworn affidavits, the nonmoving party must present "significant probative evidence to create a genuine issue of material fact." *McCarthy v. Armstrong*, 2 F.Supp.2d 231, 231 (D.Conn.1998) (internal quotation marks and citations omitted). Moreover, summary judgment should be entered "against a party who fails to make a showing sufficient to establish the exis-

tence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Thus, "[a] motion for summary judgment is an appropriate mechanism to challenge an affirmative defense." *FDIC v. Haines,* 3 F.Supp.2d 155, 159 (D.Conn.1997) (citation omitted). "Where a plaintiff uses a summary judgment motion ... to challenge the legal sufficiency of an affirmative defense ... a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case." *FDIC v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (alterations in original; citations and internal quotation marks omitted).

## III. *FACTS*

On July 5, 2001, this court issued its Ruling on Plaintiffs' Motion for Preliminary Injunction ("Preliminary Injunction Ruling"), in which the court, *inter alia,* made forty-nine findings of fact. The parties have also filed, pursuant to this court's local rules, statements of each material fact as to which the moving party contends there is no genuine issue to be tried, and which the opposing party either admits or denies. *See* D. Conn. L. Civ. R. 9(c) (2002).[1] The relevant facts which follow are not in dispute.[2]

1. Plaintiffs Robert Murphy and Mary Murphy are the owners of, and have resided at, 25 Jefferson Street, New Milford, Connecticut for approximately twenty-eight (28) years.

2. Plaintiff's home is in a single-family residential neighborhood, at the end of a cul-de-sac, on which seven (7) houses are located.

3. Plaintiffs started hosting prayer group meetings in their home on Sunday afternoons in 1994, after Mr. Murphy became ill.

4. Mr. Murphy testified that he and his wife and six children had always hosted various social gatherings in their home and would often have fifty (50) to sixty (60) guests, depending on the event.

5. The prayer meetings generally last from 4:30 to 6:30 p.m. on Sunday afternoons.

6. Some people who attend the prayer meetings come earlier than 4:30 for other matters, such as fund-raising or clothing or food donation drives, and many people stay after 6:30 p.m. for dinner.

7. Plaintiffs do not limit the number of people they invite to the prayer group meetings.

8. Plaintiffs' meetings are not open to the general public.

---

1. The local rules were amended and renumbered January 1, 2003. *See* D. Conn. L. Civ. R. 56(a) (former Rule 9(c)). However, the parties filed their statements of material fact when the previous numbering was in force, and thus those documents are appropriately titled "Local Rule 9(c)(1) Statements" and "Local Rule 9(c)(2) Statements." To maintain consistency with the documents filed in this case, the court will refer to the rules by their 2002 numbering in this decision.

2. Unless otherwise noted, each of these facts is admitted, in form or substance, in the opposing party's Local Rule 9(c)(2) Statement. [*See* doc. ## 91, 97; *see also* Preliminary Injunction Ruling (doc. # 40) at ¶¶ 1–49.] Defendants have acknowledged that counsel for both parties agree that the only evidence necessary for the court's decision is that which can be found in the record from the preliminary injunction hearing, the court's statements of fact in its rulings, and certain discovery responses. [Def.s' Mem. in Support of Mot. Summ. J. (doc. # 77) at p. 5.]

9. The number of people attending the prayer group varies, but is never less than ten to twelve people.

10. The prayer group meetings generally take place on an enclosed porch at the back of the house.

11. The number of people attending the weekly prayer group meeting has declined, in part because of the enforcement action taken by the ZEO and NMZC, and a fear or belief maintained by some invitees that they will be arrested for attending.[3]

12. Mr. Murphy testified at the hearing on plaintiffs' motion for preliminary injunction (the "Preliminary Injunction Hearing") that the weekly prayer group meetings are an important part of his faith because of the way he was raised and, for him, did not take the place of church. He testified that the prayer meetings brought "him closer to God" and changed his life after he became ill.

13. Mr. Murphy testified at the Preliminary Injunction Hearing that his religious beliefs required him to hold the prayer group meetings on Sunday and that the enforcement of the Cease and Desist Order would impede his ability to practice his beliefs.

14. Plaintiffs built an addition to their home in August 2000, creating a new garage with an upstairs living area. At that time, the existing driveway stopped at the addition. Plaintiffs then built a roughed-in driveway to a handicapped-parking area at the back of the addition, although it is apparently used for more than handicapped parking. [*Compare* Pl.s' L.R. 9(c)(1) Statement *with* Def.s' L.R. 9(c)(2) Statement.]

15. Plaintiffs obtained a permit to pave the rough portion of the driveway and the handicapped parking area in November 2000. Plaintiffs did not pave the driveway during the fall because it was too late in the year, but indicated that they planned to do so in the future.

16. The NMZC and the ZEO have no authority to issue or revoke driveway permits. Rather, this authority is vested in the Mayor's office, and in the public works department.

17. Around August 2000, the zoning office began receiving complaints about plaintiffs' meetings because of traffic concerns, parking on the street, and parking in the rear yard.

18. After complaining to the zoning office, the neighbors then began expressing their concerns at the public participation sessions before the NMZC.

19. Once the NMZC began receiving these complaints from plaintiffs' neighbors, it instructed the ZEO to investigate the situation and to speak with plaintiffs.

20. Plaintiffs' neighbors submitted letters to the commissioners detailing their concerns. Specifically, the neighbors'

---

**3.** Plaintiffs' statement of fact, taken directly from the court's Preliminary Injunction Ruling, states that the number has declined "because of the enforcement action and the town's position since 'they're afraid [they will be] arrested.'" [Pl.s' L.R. 9(c)(1) Statement ¶ 11.] Defendants "[a]dmit [this paragraph] except for the portion which refers to the 'town's position' and the fear of arrest due to said town" because the "Town of New Milford is not a party to this action" and "the zoning commission [cannot] control the position of said town." [Def.s' L.R. 9(c)(2) Statement ¶ 11.] The court's restatement of this fact in this ruling is consistent with the parties' admissions and the court's previous findings.

concerns stemmed from the increased flow of traffic on the street and fear that, in the event of an accident, emergency personnel would be unable to maneuver around the vehicles. The neighbors also expressed concerns about the safety of children playing in the cul-de-sac.

21. The police have been called to plaintiffs' home on several occasions due to complaints about the number of parked cars, but plaintiffs have not been cited for any violation.

22. After her investigation of the neighbors' complaints, the ZEO requested that the NMZC issue an opinion on whether plaintiffs' use of their property conformed with the town's zoning regulations.

23. On November 28, 2000, the NMZC issued an opinion regarding whether the Sunday meetings were a permitted use under the zoning regulations.

24. The NMZC found that the regularly scheduled meetings are not a customary accessory use in a single-family residential area. In determining whether a particular use is a "customary accessory use," the NMZC uses a case-by-case analysis. In other words, there are no *explicit* zoning regulations that, for example, define "customary accessory use" by the number of visitors and regularity of meetings in a private home.[4]

25. The NMZC stated that:

[s]uch regularly scheduled meetings together with the construction and use of the parking lot associated therewith, in the opinion of the commission, do not constitute a permitted principal use of a single-family home in an R–40 zone because they are not listed as such in the zoning regulations, nor do they constitute a permitted accessory use because, to the knowledge of the commission, such use has not been commonly, habitually and by long practice been established as reasonably associated with a single-family home in an R–40 zone.

26. Plaintiffs received a letter from the ZEO on November 29, 2000, stating

---

**4.** Plaintiffs' statement of fact, taken directly from the court's Preliminary Injunction Ruling, states that "the town uses a case-by-case analysis *and relies upon no zoning guidelines*." [Pl.s' L.R. 9(c)(1) Statement ¶ 24 (emphasis added).] Defendants "[a]dmit [this paragraph], except for the portion which states that there are 'no zoning guidelines,' " because the zoning regulations do define "accessory use" and lists which uses are expressly permitted. [Def.s' L.R. 9(c)(2) Statement ¶ 24 (also noting that case law is additional authority.)] Despite defendants' partial denial, there can be no material dispute the ZEO's and NMZC's decision was subjective. [*See* Transcript of Preliminary Injunction Hearing, January 18, 2001 ("Tr."), at 103 (where the ZEO admitted that the "[z]oning regulations ... are somewhat open to interpretation in that you have to determine what's customary," and "something you have to figure out on a case by case [basis]")]; Tr. 107 (where the ZEO admitted that "[t]here's nothing specific" in the regulations for determining "[h]ow large" a meeting can be); Tr. 111–12 (where the ZEO admitted that the term "regularly-scheduled meetings" is not defined anywhere in the zoning regulations); Tr. 132 (where a commissioner stated that the NMZC makes "decisions as to what is an acceptable accessory use and what isn't one" based on "good common sense and investigation"); Tr. 132–33 (where, when asked whether there are "any objective criteria for making [an accessory use] decision or [whether it is] totally subjective, based upon [the commissioner's] own common sense," the commissioner responded that "[i]t's subjective"); Tr. 138 (where the commissioner admitted that 25-attendee limit was "completely subjective"); Tr. 144–45 (where the commissioner admitted that the term "regularly-scheduled meetings" could apply to meetings held once a week, once every 10 days, once every 2 weeks, once a month, or once a year). In any event, the court's restatement of this fact is consistent with the parties' admissions and the court's previous findings.

that the meetings plaintiffs held on Sunday afternoons were prohibited and that plaintiffs were not permitted to use their rear yard as a parking lot for the attendees of these meetings.[5]

27. The ZEO testified that the zoning regulations do not permit a large assembly of people in a single-family residential neighborhood. When asked what was too large, the ZEO responded that there was not a set number. The decision turned on when the number of people assembled became so large that it had a negative impact on the neighborhood.

28. The ZEO did not know if the Commission investigated whether other people had prayer group meetings in their homes, or other regular group meetings, such as Cub Scout meetings.

29. Prior to issuing their opinion, commissioners were given photographs taken by plaintiffs' neighbors of cars parked in plaintiffs' backyard and on the cul-de-sac.

30. The ZEO testified that she visited plaintiffs' property on three Sundays and found that the number of cars in plaintiffs' driveway or rear yard and in the cul-de-sac ranged from 13 to 20 cars. She did not find that any of the parked cars blocked access to any of the neighbors' properties.

31. On December 19, 2000, the ZEO issued a cease and desist order, charging plaintiffs with violations of the single-family district regulations which [do] not permit use of said premises as a meeting place by a diverse group of people (25 to 40), who are not "family" as that term is defined in these regulations, on a regularly scheduled basis, in this instance each Sunday, throughout the year; nor do the regulations permit the use of a parking lot in the rear yard of said premises which is being used to meet the parking needs of those persons attending the meetings on property located in the Residential Zone in the Town of New Milford.

32. The cease and desist order was based on the Commission's opinion, but the ZEO was not required by the opinion to issue the order.

33. Cease and desist orders are normally appealed to the Zoning Board of Appeals. No appeal has been taken in this case.

34. Brooks Temple, a New Milford zoning commissioner, testified that plaintiffs' neighbors raised their safety concerns during the public participation session of each Commission meeting.

35. Temple stated that the complaints were raised over a four month period and the neighbors' concern seemed to be that the activities surrounding plaintiffs' meetings were escalating.

36. The Commission found that there were, on average, 40 people attending the meetings, with 25 to 40 cars on average. These numbers appeared to be based on statements from the neighbors, as well as individual commissioners' observations.

37. Temple stated that all prayer meetings would not be prohibited, and that

---

**5.** Although defendants "[a]dmit [this paragraph] except that not all meetings are prohibited, only those that exceed a certain size limit and occur weekly" [Def.s' L.R. 9(c)(2) Statement ¶ 26 (citing Preliminary Injunction Hearing Exhibit ("Ex.") 4)], defendants' exception is inconsistent with the documentary evidence. There can be no material dispute of fact that the November 29, 2000 letter, which is Exhibit 2, did *not* include a limitation on size or frequency.

it was an expected accessory use that people would pray in their homes. The Commission did not intend to prohibit all prayer groups or all meetings in residential areas.

38. The zoning regulations in effect at the time of the Commission's opinion were permissive, providing that a use is prohibited unless it is specifically permitted.

39. The regulations do not specify the expected accessory uses for particular areas, and Temple agreed that the determination was subjective.

40. The Commission's investigation of the complaints did not substantiate the safety concerns, but found an increased volume of cars that would increase traffic and could create a potential for safety concerns.

41. Temple testified that the key to the Commission's decision was the presence of larger activity than what could be expected in a single family home. In this situation, the Commission found that "too large" was 25 or more people. Temple admitted that the number was completely subjective.

42. Temple also testified that the Commission had no objective criteria to determine whether prayer group meetings are an appropriate accessory use, or whether a special permit would issue if plaintiffs' use became a church. [*Compare* Pl.s' L.R. 9(c)(1) Statement ¶ 42 *with* Def.s' L.R. 9(c)(2) Statement ¶ 42.]

43. The zoning regulations list twenty-five uses allowed by special permit in residential areas. There are no criteria listed in the regulations under which the commissioners are to evaluate special permit applications for a use not listed in the regulations.

44. The ZEO's decision was appealable to the New Milford Zoning Board of Appeals ("NM–ZBA"). [*Compare* Pl.s' L.R. 9(c)(1) Statement ¶ 44 *with* Def.s' L.R. 9(c)(2) Statement ¶ 44.] [6]

45. The Commission's decision was based on an evaluation of the complaints, concern about safety implications, and "common sense."

46. There is no evidence of religious animus on the part of plaintiffs' neighbors, the Commission, or the ZEO.

47. By Cease and Desist Order, dated December 19, 2000, the defendant ZEO ordered plaintiffs to cease and desist using their "premises as a meeting place by a diverse group of people (25 to 40), who are not 'family' …, on a regularly scheduled basis …" [*Compare* Pl.s' L.R. 9(c)(1) Statement ¶ 47 *with* Def.s' L.R. 9(c)(2) Statement ¶ 47; *see* Cease and Desist Order (Ex. 4).]

48. On December 20, 2000, plaintiffs filed an Amended Complaint [doc. # 12] and Motion for Temporary Restraining Order [doc. # 10].

49. On December 21, 2000, Judge Eginton granted the Motion for Temporary Injunction and Motion for Temporary Restraining Order ("TRO"). [Doc. # 18.] The TRO allowed plaintiffs to continue their prayer meetings.

50. The parties consented to trial before a United States Magistrate Judge [doc. # 20] and the case was transferred to the undersigned [doc. # 19].

51. On January 18, 2001, the court held a hearing on plaintiffs' application for a preliminary injunction, and that appli-

---

6. This is discussed further in the Discussion section, *infra.*

cation was granted on July 5, 2001 [doc. # 40].

52. Subsequently, defendants filed a motion to dismiss on the ground that the court had no subject matter jurisdiction to hear plaintiffs' claims. Plaintiffs opposed that motion, except for the Eighth Cause of Action which was withdrawn.

53. On September 6, 2002, the court issued its Ruling on Defendants' Motion to Dismiss, denying the motion. [Doc. # 68.]

54. The defendant NMZC was, and currently is, the agency empowered under the Connecticut General Statutes to perform the function of a zoning commission in the Town of New Milford and is an entity capable of being sued.[7]

55. Neither the Town of New Milford, nor its police personnel, are defendants in this action.

56. Neither Patrick Murphy, the son of Robert Murphy and Mary Murphy, nor any attendees of the meetings which are the subject of this matter, are parties to this action.

57. Defendant Kathy Castagnetta is the ZEO of the town of New Milford.

58. Defendant NMZC has no enforcement powers, having relinquished them to the ZEO.

59. These enforcement powers include the ability to issue cease and desist orders and institute an injunction action in Connecticut Superior Court, but do not include the ability to arrest persons who are in violation of the New Milford Zoning Regulations.

60. The New Milford Zoning Regulations are permissive in nature—meaning that any use that is not specifically permitted is prohibited.

61. The Cease and Desist Order does not prohibit all meetings at plaintiffs' residence, but only those meetings at plaintiffs' home which are regularly scheduled and have 25–40 non-family members in attendance.

62. The TRO issued by Judge Eginton on December 21, 2000, placed limits on the number of permissible attendees at plaintiffs' regularly scheduled meetings to no more than 25 non-family members and 10 family members.

63. Plaintiff Robert Murphy testified at the Preliminary Injunction Hearing that "pray[ing] as family in [his] home" is "where it started" and "the whole principle [they] based everything on." [Tr. 48; *compare* Def.s' L.R. 9(c)(1) Statement ¶ 15 *with* Pl.s' L.R. 9(c)(2) ¶ 15.]

64. Other activities occur at the plaintiffs' home, but these occur either before or after the regularly scheduled meetings and are done by people who are not part of the general prayer group.

65. Only prayer, bible study, and the sharing of meals take place at these meetings.

66. In response to cross examination about what plaintiffs would do if they wanted to have a meetings larger in size than that permitted by the TRO, plaintiff Robert Murphy testified that, in the past, plaintiffs and their guests "have gone to a place called

---

**7.** Although it may result in the facts not appearing chronologically, this fact and those that follow were admitted by plaintiffs in the context of defendants' motion for summary judgment, and the court believes that arranging them to correspond to the documents filed by the parties will make them easier to review and/or reference.

'My Father's House," ' which is a "retreat center." [Tr. 47–48; *compare* Def.s' L.R. 9(c)(1) Statement ¶ 18 *with* Pl.s' L.R. 9(c)(2) ¶ 18.]

67. Since at least September 2000, the average size of plaintiffs' meetings has been 20 to 25 people, including family members.

68. These meetings are by invitation only, and not open to the public, and only once has a person "dropped in" on one of those meetings.

69. Meetings are small enough to be held in a kitchen or living room of a single family home.

70. The only other attendees at these weekly meetings, aside from family members, are long-time friends of plaintiffs' family.

71. The reduction in the number of people attending these meetings since August 2000 is due to the fact that members of plaintiffs' prayer group have started their own weekly meetings with other members.

72. The NMZC rejected a plan proposed by plaintiffs to construct a parking lot on plaintiffs' property. Plaintiff Robert Murphy avers that he "thereafter withdrew [his] request" and has "never constructed any parking lot behind [his] home." [Second Affidavit of Robert Murphy (doc. # 88) at ¶ 1; *compare* Def.s' L.R. 9(c)(1) Statement ¶ 27 *with* Pl.s' L.R. 9(c)(2) ¶ 27.]

73. According to plaintiff Robert Murphy, the weekly meetings in question started in 1994.

74. Complaints were first received by defendants regarding the use of plaintiffs' property as a weekly meeting place in August 2000.

75. The issue of whether plaintiffs' use of their single family home as a location for large weekly meetings was in compliance with the zoning regulations was addressed at four NMZC meetings over a four-month period.

## IV. DISCUSSION

### A. The Scope of This Decision

Given the significance attributed by the parties to the issues involved in this case, and the potential impact of this decision, it is important to define the intended scope of the court's ruling. The issue presented is the legality of the ZEO's Cease and Desist Order, reproduced below in its entirety:

**CEASE AND DESIST ORDER 00–24**

TO: Robert W. and Mary Murphy Date: December 19, 2000

Mailing Address: 25 Jefferson Drive, New Milford, CT

Pursuant to the authority vested in me by the Zoning Regulations of the Town of New Milford, Connecticut, you are hereby ordered and directed within *fifteen (15) days of the date herein*, to discontinue and/or remedy the violations and conditions at premises identified as: 25 Jefferson Drive, New Milford

Located at: 25 Jefferson Drive, New Milford Property Owner: Robert and Mary Murphy

These conditions violate Chapter 25, (Single Family District Regulations) which does not permit use of said premises as a meeting place by a diverse group of people (25 to 40), who are not "family" as that term is defined in these regulations, on a regularly scheduled basis, in this instance each Sunday, throughout the year; nor do the regulations permit the use of a parking lot in the rear yard of said premises which is being used to meet the parking needs of those persons attending the meetings on

property located in the Residential Zone in the Town of New Milford.

A further inspection will be made of the subject premises after *fifteen (15) days* and, if compliance is not established, the full penalties prescribed by law and as set forth in the State Statute, Section 8–12 will be involved. If you have any questions as to the manner and time of establishing compliance, you may consult the Zoning Enforcement Officer.

By: _____/s/_____

 Kathleen Castagnetta, Zoning Enforcement Officer

[Ex. 4 (emphasis in original).]

Although this litigation was initiated *before* the issuance of the Cease and Desist Order,[8] the court, on two occasions, recognized the ripeness problems plaintiffs would face absent inclusion of the Cease and Desist Order, and in fact ordered the filing of an amended complaint "incorporating the issuance of the cease and desist order by the ZEO." [Prelim. Inj. Ruling, *pub'd at Murphy v. Zoning Commission,* 148 F.Supp.2d 173, 183 (D.Conn.2001); *see also* Ruling on Def.s' Mot. Dismiss ("Dismissal Ruling"), *pub'd at Murphy v. Zoning Commission,* 223 F.Supp.2d 377, 384–85 (D.Conn.2002).][9] In the Preliminary Injunction Ruling, the court acknowledged "that there [was] merit to defendants' ar-gument that, because the town as of the date of the [first] Amended Complaint was filed had taken no enforcement action, plaintiffs' claims [were] not ripe for review," but held that, "in the context of *this particular case,* . . . at a minimum, plaintiffs' claim that the [NMZC's] *actions* violated [RLUIPA was] ripe for judicial review." [Prelim. Inj. Ruling, 148 F.Supp.2d at 183.] In the Ruling on Defendants' Motion to Dismiss, the court reiterated the "importan[ce of] the cease and desist letter issued by the ZEO" on the ripeness issue, and the "unique circumstances of this case." [Ruling on Def.s' Mot. Dismiss, 223 F.Supp.2d at 384–85 (citations and internal quotations omitted).] As this court has made clear, the issuance and potential enforcement of the Cease and Desist Order (and the ZEO's and NMZC's interpretation of the New Milford zoning regulations now embodied in that order)[10] is the controversy that gives this court subject matter jurisdiction. Accordingly, this ruling is narrowly tailored to the issue presented, and should not be construed to extend to the zoning regulations as a whole, the NMZC's or ZEO's power generally, or otherwise beyond the specific controversy in this case.

### B. *Plaintiffs' Claims*

Plaintiffs originally moved for summary judgment "on each of the claims in Plain-

8. Prior to the filing of this case, the NMZC had issued its opinion (the "NMZC Opinion") that plaintiffs' meetings were prohibited by the zoning regulations, and directing the ZEO to issue a cease and desist order. [Ex. 516 (issued on November 28, 2000).]

9. For convenience and ease of reading, the court will refer to these two rulings by their titles (i.e., "Preliminary Injunction Ruling" and "Ruling on Defendants' Motion to Dismiss"), but cite to the published decisions in the Federal Supplement (2d Series).

10. Defendants have acknowledged that, "[i]n this matter, the [NMZC] only issued an opin-ion which could not be enforced by it . . . The [defendant ZEO] made the only appealable decision." [Def.s' L.R. 9(c)(2) Statement ¶ 44 (citing Ex. 515, § 185–010).] Although the interpretation of the zoning regulations described in the Cease and Desist Order derives from the NMZC's Opinion [Ex. 516], the parties agree that the NMZC has no enforcement powers, having relinquished them to the ZEO [*see, supra,* Section III, ¶ 58; Def.s' L.R. 9(c)(1) Statement ¶ 5; Pl.s' L.R. 9(c)(2) Statement ¶ 5.] As such, the legality of the Cease and Desist Order is the only issue ripe for resolution.

tiffs' Amended Complaint except for the Eighth Cause of Action, which the plaintiffs have [previously] withdrawn." [Pl.s' Am. Mem. in Support of Mot. Summ. J. (doc. # 84) at p. 1; *see also* Ruling on Def.s' Mot. Dismiss, 223 F.Supp.2d at 385 n. 9 (noting that plaintiffs had withdrawn the Eighth Cause of Action prior to that ruling).] The court also noted in its Ruling on Defendants' Motion to Dismiss that the Eleventh Cause of Action and Thirteenth Cause of Action appeared to be duplicative, in that their titles both reference Connecticut ACRF. [Ruling on Def.s' Mot. Dismiss, 223 F.Supp.2d at 386 n. 12.] The body of the Eleventh Cause of Action, however, actually references the Connecticut Constitution, and thus would be duplicative of the Ninth Cause of Action, which plaintiffs have agreed only mirrors their claims brought under the United States Constitution. Additionally, out of those three counts (i.e., the ninth, eleventh, and thirteenth), plaintiffs press only two categories of claims. Accordingly, to the extent it remained viable after the Ruling on Defendants' Motion to dismiss, the Eleventh Cause of Action is deemed waived. Plaintiffs have also expressly abandoned the Tenth Cause of Action ("ultra vires"). [Doc. # 96 at p. 3.] Defendants further argue that plaintiffs have abandoned their Seventh Cause of Action (asserting violations of the Establishment Clause) but, as plaintiffs dispute that argument, the court will address it in more detail below.

In sum, the court takes up the below-listed plaintiffs' claims, identified parenthetically by the corresponding count in the Fourth Amended Complaint: [1] Free Speech (1st count); [2] Peaceable Assembly (2nd count); [3] Right to Privacy (3rd count); [4] Free Exercise of Religion (4th count); [5] Due Process (5th count); [6] Equal Protection (6th count); [7] Establishment of Religion (7th count); [8] Connecticut Constitution (9th count); [9] RLUIPA (12th count); and [10] ACRF (13th count).

### 1. *Free Speech*

As the First Cause of Action of the Fourth Amended Complaint, plaintiffs assert that defendants' actions violate plaintiffs' rights to freedom of speech secured under the First Amendment to the United States Constitution.[11] Specifically, plaintiffs argue that defendants' actions related to the issuance of the Cease and Desist Order are predicated on the content of the speech engaged in at plaintiffs' home; that defendants' prohibition is impermissibly overbroad; and that defendants' prohibition is impermissibly under-inclusive. [*See, e.g.,* Pl.s' Am. Mem. in Support of Summ. J. (doc. # 84) at pp. 11–14.] Defendants argue that Cease and Desist Order is content-neutral and/or a permissible time, place and manner restriction. [*See, e.g.,* Def.s' Mem. in Support of Mot. Summ. J. (doc. # 77) at pp. 7–9.] Defendants' argument is persuasive.

Plaintiffs direct the court to no evidence supporting their claims that "Defendants' prohibition is based on the type of speech that takes place at the Murphys' meetings" [doc. # 84 at p. 12] (thus making it content-based); that the Cease and Desist Order "prohibit[s] 'prayer meetings'" (thus making it overbroad, because it covers too much conduct) [*id.* at p. 13] [12]; that

---

**11.** The First Amendment provides, in relevant part: "Congress shall make no law ... abridging the freedom of speech ...." The Fourteenth Amendment makes this limitation applicable to the States, *see Gitlow v. New York,* 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925), and to their political subdivisions, *see Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

**12.** Here, plaintiffs inexplicably and without any foundation argue the following: "Prohib-

the Cease and Desist Order "is aimed only at meetings with religious content, while failing to regulate meetings for any other purpose" (thus making it under-inclusive) [*id.* at p. 14]; or that, under the Cease and Desist Order, plaintiffs "are free to have whatever meetings they wish, so long as nobody prays during the meeting" [*id.*]. In making these sweeping allegations, plaintiffs never quote the Cease and Desist Order or the NMZC's Opinion. Indeed, they could not, for the Cease and Desist Order prohibits only the "use of [plaintiffs' home] as a meeting place by a diverse [13] group of people (25 to 40), who are not 'family' . . ., on a regularly scheduled basis . . ." [Ex. 4.] It does not limit the use by the type or purpose of the meetings. Because no evidence supports plaintiffs' position, and because plaintiffs advance no other arguments supporting their claims of a Free Speech violation, plaintiffs' motion for summary judgment on count one is denied, and defendants' motion for summary judgment is granted.

## 2. *Peaceable Assembly*

■ Plaintiffs argue that defendants "cannot furnish a compelling interest to justify their abrogation of [plaintiffs' right to assemble peaceably]," and therefore that plaintiffs are entitled to judgment as a matter of law. Defendants argue that the restrictions in the Cease and Desist Order constitute only a minimal interference and that they are rationally related to a legitimate government interest.

■ The right to assemble peaceably is among the most precious of the liberties safeguarded by the Bill of Rights, and is intimately connected both in origin and in purpose with the other First Amendment rights. *See United Mine Workers of America, Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967). The right to "expressive association" protects the right of individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances. *See Sanitation and Recycling Industry, Inc. v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997); *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) ("implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends"). To be cognizable, the interference with associational

iting 'prayer meetings' . . . affects gatherings at the Murphy home which may be totally unrelated to religious content, since the Murphys can never know for sure when a zoning official might decide that a gathering at the Murphy residence has crossed the line and become a prohibited 'prayer meeting.' Would saying grace with guests before a meal be deemed a prayer meeting, since prayer was invoked? Or, would saying bedtime prayers with a visiting child convert an otherwise permissible gathering into an outlawed prayer meeting? And what about a spontaneous prayer for healing on behalf of an invited guest who suddenly becomes ill during his visit at the Murphy home? Such examples can go on and on, and they demonstrate vividly the truly intrusive nature of the Commis-

sion's prohibition on otherwise lawful private activity in the Murphy home. On such a basis alone, the Commission's decision is constitutionally defective." [Pl.s' Am. Mem. in Support of Summ. J. (doc. # 84) at pp. 13–14.] None of these examples has any basis in the facts of this case, or would run afoul of the Cease and Desist Order.

13. Although it is unclear what the ZEO or NMZC meant by the term "diverse," there is no evidence that the term constituted a limitation on content. Rather, it appears from the following parenthetical and apparent apposition that it relates either to the number of people or their familial status.

rights must be "direct and substantial" or "significant." *Fernandez v. City of Poughkeepsie,* 67 F.Supp.2d 222, 226–227 (S.D.N.Y.1999) (citing *Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 228 (2d Cir. 1996)).

■ Whenever the state restricts the right of assembly, there is no presumption of constitutionality; the state must have a compelling interest in the subject matter to justify abridgment, and the scope of the abridgment itself must not be greater than reasonably necessary to serve the state interest. *Blasecki v. City of Durham,* 456 F.2d 87, 91 (4th Cir.1972) (citing, *inter alia, Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)).

Neither party to this case has briefed this issue extensively. In its own review of the record, without determining whether traffic, drainage, and safety are compelling interests in this context,[14] the court finds, based on the evidence in the record, that the scope of the abridgment—a prohibition on the number of people *inside* plaintiffs' house—is "greater than reasonably necessary to serve [those] interest[s]" because lesser limitations (for example, limiting the number of vehicles parked on the street) are reasonably available. Therefore, because plaintiffs' right to assemble is *directly* related to their exercise of religion [*see infra*], and because defendants have not directed the court to any facts showing a compelling interest in limiting the number of *assemblers* (rather than cars, for example) or that such limitation is no greater than reasonably necessary to serve any substantial interest, plaintiffs' amended motion for summary judgment on count two is granted, and defendants' motion for summary judgment is denied.

### 3. *Right to Privacy*

■ Plaintiffs argue that, by regulating what occurs in plaintiffs' home, defendants have violated plaintiffs' right to privacy under the First Amendment. [Pl.s' Mem. in Support of Summ. J. at p. 10.] Defendants argue that, because plaintiffs have not shown any disclosure of personal matters, or that defendants' actions impinge on plaintiffs' independence in making certain kinds of decisions, plaintiffs have not demonstrated any "privacy" right. [Def.s' Mem. in Support of Mot. Summ. J. at p. 9.] Plaintiffs respond that privacy rights are not limited to those described by defendants, and rely on the right to privacy articulated in *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) ("If the First Amendment means anything, it means that a State has no business telling a man sitting alone in his own house what books he may read . . ."). [Plaintiffs' Opp. to Def.'s Mot. Summ. J. at p. 14; *see also* Pl.'s Mem. in Support of Summ. J. at p. 10.] Plaintiffs have not persuaded the court that privacy rights are implicated here.

Again, the parties have not briefed this particular issue in much detail. However, the court has reviewed the record, and it is clear that the Cease and Desist Order does not impinge on plaintiffs' privacy; rather, it limits plaintiffs' interaction with others. In other words, it does not regulate what plaintiffs, or even plaintiffs' family, may do in plaintiffs' own home; it regulates only the number of unrelated outsiders who may visit on a regular basis. To the extent the Cease and Desist Order affects plaintiffs' privacy rights under the First Amendment, those rights are subsumed within plaintiffs' other First Amendment claims. Therefore, plaintiffs' motion for summary judgment on the Third Cause of Action can be denied as moot, and defen-

**14.** *See, e.g.,* Def.s' Mem. in Support of Mot. Summ. J. at p. 2 (noting those interests).

dants' motion for summary judgment is granted.

### 4. *Free Exercise of Religion*

■ This is, at its heart, a Free Exercise case. The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* ..." (Emphasis added.). It applies to the states via the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The central question before this court is whether the Cease and Desist Order constitutes an impermissible limitation on the free exercise of religion.

■■ Supreme Court case law establishes the "general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah* ("*Lukumi*"), 508 U.S. 520, 531, 113 S.Ct. 2217,

124 L.Ed.2d 472 (1993)[15] (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith* ("*Smith*"), 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)). As the Court noted in *Lukumi*, "[n]eutrality and general applicability are interrelated," and the failure to satisfy one requirement is a likely indication that the other has not been satisfied. *Id.*[16] "A law failing to satisfy these requirements must be justified by a *compelling governmental interest* and must be *narrowly tailored* to advance that interest." *Id.* at 531–32, 113 S.Ct. 2217 (emphasis added).[17]

### a. *Neutrality*

■ The Free Exercise Clause protects individuals from laws that "discriminate against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532, 113 S.Ct. 2217. Thus, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533, 113 S.Ct. 2217 (citing *Smith*, 494 U.S. at 878–79, 110 S.Ct. 1595).

---

**15.** In *Lukumi*, a church brought an action pursuant to the Free Exercise Clause, among other things, challenging city ordinances dealing with the ritual slaughter of animals. The ordinances were enacted in response to the church's announcement of its plan to practice its religion on land that it leased in the city.

**16.** *See also id.* at 557, 113 S.Ct. 2217 (Scalia, J., concurring) (finding it unnecessary to distinguish between the "neutrality" and "general applicability" requirements, and "frankly acknowledg[ing] that the terms are not only 'interrelated,' ... but substantially overlap.")

**17.** Plaintiffs also argue that, because they assert a colorable "hybrid claim"—in other words, that defendants' actions violated the Free Exercise Clause as well as some "companion right"—the court should apply strict scrutiny even if the Cease and Desist Order were found to be neutral and generally applicable. [*See* Pl.'s Mem. in Support of Summ. J. at p. 8 (quoting what plaintiffs purport to

be *Smith*, even though that language is found nowhere in that decision).] However, our Court of Appeals has held, consistently with Sixth Circuit and contrary to the First, Ninth, and Tenth Circuits, that the language in *Smith* on which plaintiffs rely was "dicta" that the Court of Appeals was "not bound" to follow, and which the Court of Appeals "decline[d] to adopt." *Leebaert v. Harrington*, 332 F.3d 134, 143–44 (2d Cir.2003). Were the language in *Smith* binding, this court could conclude that plaintiffs' Peaceable Assembly claim is the type of companion right that might justify application of the higher standard. However, in light of *Leebaert*, this court also "will not use a stricter legal standard to evaluate hybrid claims." *Id.* at 144 (citation and internal quotations omitted). In any event, given the court's holding on neutrality and general applicability, it would also be unnecessary to reach that decision.

█ In evaluating the neutrality requirement, the first step is to look to the text, "for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* The "law" in our case is the Cease and Desist Order [Ex. 4]. Despite the vague references to a "diverse" group of people, and meetings that occur "each Sunday," the Cease and Desist Order is neutral on its face.

█ That does not end the inquiry, however. The Free Exercise Clause "extends beyond facial discrimination" and "forbids subtle departures from neutrality . . . and covert suppression of particular religious beliefs." *Id.* at 534 (citations and internal quotations omitted). The court must "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id.* (citation and internal quotations omitted).

In *Lukumi*, the Court found that the ordinance at issue constituted an impermissible "religious gerrymander" because the law was drafted to achieve the suppression of the religious activity at issue, and because the religious participants "alone [were] the exclusive legislative concern." *Id.* at 535–36, 113 S.Ct. 2217. The Court also found it significant that the law "proscribe[d] more religious conduct than [was] necessary to achieve their stated ends." *Id.* at 538, 113 S.Ct. 2217. The Court further noted that "[t]he neutrality of a law is suspect if First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation." *Id.* at 539, 113 S.Ct. 2217. The concerns noted by the Supreme Court in *Lukumi* are applicable to this case.

The Cease and Desist Order does not pretend to be a law of general applicability, since it was directed solely toward the plaintiffs' activity. In the absence of evidence that the governmental action was motivated by the religious nature of the meetings, it can hardly be characterized as a "religious gerrymander." Nonetheless, the Cease and Desist Order was indisputably intended to limit religious activity, as the ZEO and NMZC were aware of the religious nature of the plaintiffs' meetings.

Moreover, the Cease and Desist Order proscribes more religious conduct than necessary to achieve defendants' stated ends. *Id.* at 538, 113 S.Ct. 2217. As noted previously, defendants' stated concerns in limiting the size of plaintiffs' meetings were traffic and safety issues centered around the number of vehicles parked in the street. However, the Cease and Desist Order limits only the number of *people* permitted to attend the meetings. If, for example, the ZEO identified problems related to the parking of more than twenty cars on the street and at plaintiffs' home, and plaintiffs were willing to arrange for car pools or shuttles to reduce the number of vehicles, their meetings would still be unlawful as long as the number of unrelated people exceeded twenty-five—even if they were all dropped off by a bus. Therefore, the Cease and Desist Order proscribes more religious conduct than is necessary to achieve defendants' stated ends.

The neutrality of the Cease and Desist Order is further suspect because plaintiffs' First Amendment freedoms are curtailed to prevent isolated collateral harms not themselves prohibited by direct regulation. Defendants agree that there is no direct and express regulation limiting the number of visitors, with vehicles or not, that residents of single family homes may have. There is only the ZEO's and/or NMZC's interpretation of what uses are "customary" in plaintiffs' neighborhood.

Consequently, although the Cease and Desist Order is facially neutral, its neutrality is, at a minimum, suspect. Before answering this question definitively, the court next turns to the issue of general applicability, because, as the Supreme Court has noted, neutrality and general applicability are interrelated, and the failure to satisfy one requirement is a likely indication that the other has not been satisfied. *Lukumi,* 508 U.S. at 531, 113 S.Ct. 2217.

### b. *General Applicability*

■ The second requirement of the Free Exercise Clause is that "laws burdening religious practice must be of general applicability." *Lukumi,* 508 U.S. at 542, 113 S.Ct. 2217 (citing *Smith,* 494 U.S. at 879–81, 110 S.Ct. 1595). Of course, "[a]ll laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* The Free Exercise Clause prohibits government from deciding "that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.*

The question of general applicability in this case is answered more easily than the question of neutrality, because the "law" in this case is the Cease and Desist Order— directed *only* to plaintiffs. It is not an ordinance or regulation applicable to the general population. Plaintiffs have engaged in certain conduct, which has a purely religious motivation, and defendants have decided to advance the governmental interests they have identified only against plaintiffs' conduct.

Indeed, this case presents a sharp contrast to *Smith,* where the law in question had general applicability. *See Smith,* 494 U.S. at 879–83, 110 S.Ct. 1595. The Supreme Court recognized the important distinction between generally applicable laws and those involving "individualized governmental assessment[s]." *Id.* at 884, 110 S.Ct. 1595. The *Smith* court cited with approval the plurality's decision in *Bowen v. Roy,* 476 U.S. 693, 708, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), recognizing the "proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith,* 494 U.S. at 884, 110 S.Ct. 1595. *See also Lukumi,* 508 U.S. at 537, 113 S.Ct. 2217 (relying on *Smith* for the proposition that the individualized governmental assessment required in that case supported a finding of non-neutrality).[18]

This case is specifically *about* individualized governmental assessments on exemptions from a general requirement. The zoning regulations relevant to this case are permissive, providing that a use is prohibited unless it is specifically permitted. An unlisted use will be permitted, however, if it is a "customary accessory use," or, if applicable, the property owner is granted a special permit. The regulations do not specify any expected accessory uses for particular areas, and one of the Commissioners testified in court that the determination was subjective. [*See generally, supra,* Facts ¶ 24 & n. 4.]

The subjectivity of these individualized assessments was testified to at length. As the court has already noted, the ZEO has admitted that the "[z]oning regulations . . .

---

**18.** Although this court addresses the individualized exceptions in the context of the "general applicability" test, the court recognizes that, under *Lukumi,* the fact that the ZEO and NMZC employed individualized assessments in this case is further support for a finding of non-neutrality.

are somewhat open to interpretation in that you have to determine what's customary," and "something you have to figure out on a case by case [basis]"; that "[t]here's nothing specific" in the regulations for determining "[h]ow large" a meeting can be; and that the term "regularly-scheduled meetings" is not defined anywhere in the zoning regulations. The testifying commissioner admitted that the NMZC makes "decisions as to what is an acceptable accessory use and what isn't one" based on "good common sense and investigation"; that evaluating an accessory use is "totally subjective, based upon [the commissioner's] own common sense"; that the 25–attendee limit was "completely subjective"; and that the term "regularly-scheduled meetings" could apply to meetings held once a week, once every 10 days, once every 2 weeks, once a month, or once a year. [*See, supra,* note 4.]

The Cease and Desist Order is not a generally applicable law. Furthermore, in light of the highly subjective nature of these individualized assessments, the court also concludes that it is not "neutral."

c. *Proper Standard*

The *Lukumi* court explicitly held that "[a] law failing to satisfy [the requirements of neutrality and general applicability] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." 508 U.S. at 531, 113 S.Ct. 2217. *See also id.* at 546, 113 S.Ct. 2217 ("[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny"). The "compelling interest" standard has deep roots in Free Exercise jurisprudence. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *Cf. Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) ("when a zoning law impinges upon a protected liberty"—in that case, the First Amendment right to Freedom of Speech— "it must be narrowly drawn and must further a sufficiently substantial government interest").[19] Although the *Smith* Court expressed some doubt[20] about whether the *Sherbert* test applied outside of the unemployment compensation context, *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595, the holding in *Smith* was that strict scrutiny did not apply to neutral, generally applicable laws. 494 U.S. at 879–81, 110 S.Ct. 1595. Moreover, the *Lukumi* case, from which the standard of review for this decision is taken, *was* a Free Exercise case (and outside the unemployment compensa-

---

**19.** Although defendants repeatedly argue that zoning laws are inherently local concerns and reviewed under the rational basis test, the *Schad* Court specifically noted that, although "[t]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities[,] ... the zoning power is not infinite and unchallengeable; it must be exercised within constitutional limits." 452 U.S. at 68, 101 S.Ct. 2176 (citation and internal quotations omitted). Therefore, "it is subject to judicial review; and is most often the case, the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." *Id.* (citation omitted).

**20.** The court noted that it had "never invalidated any governmental action on the basis of the *Sherbert* test except the denial of unemployment compensation," but added that, "[e]ven if [it] were to breathe into *Sherbert* some life beyond the unemployment compensation field, [it] would not apply it to require exemptions from a generally applicable criminal law" because "[t]he *Sherbert* test ... was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct." *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595.

tion context),[21] decided *after Smith.* Furthermore, the author of *Lukumi,* Justice Kennedy, also authored *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), in which the Court struck down as unconstitutional the Religious Freedom Restoration Act ("RFRA") on the basis of *Smith* (thus reaffirming the validity of *Smith* ). Reading these cases together, this court sees no conflict between *Smith* and *Lukumi.* Therefore, because the Cease and Desist Order is not neutral or generally applicable, the court applies the heightened scrutiny recognized most recently in *Lukumi.* The Cease and Desist Order must be "justified by a *compelling governmental interest* and must be *narrowly tailored* to advance that interest." *Lukumi,* 508 U.S. at 531–32, 113 S.Ct. 2217. Or, phrased slightly differently, the Cease and Desist Order must "advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Id.* at 546, 113 S.Ct. 2217 (citations and internal quotations omitted). The "compelling interest standard" that is applied once a law fails to meet the *Smith* requirements "is not 'water[ed] ... down' but 'really means what it says,'" and the law "will survive strict scrutiny only in rare cases." *Id.* (citing and quoting *Smith,* 494 U.S. at 888, 110 S.Ct. 1595).

### d. Compelling Governmental Interest

This court has already decided that defendants have shown a compelling interest in "enforcing the town's zoning regulations and ensuring the safety of residential neighborhoods." [Prelim. Inj. Ruling, 148 F.Supp.2d at 189–90.] For purposes of this ruling, the court will assume that defendants have demonstrated a compelling interest.[22] In other words, in light of the court's holding on the "narrow tailoring" test [*see infra,* next section], the court need not revisit its original decision.[23]

### e. Narrow Tailoring

■ In its Preliminary Injunction Ruling, the court held that defendants failed to show that their action furthered the compelling interest by the least restrictive means. [148 F.Supp.2d at 190.] The court found "no evidence on the record that the issuance of the cease and desist order was the 'least restrictive means' of protecting the health and safety of their community." [*Id.*] Although that finding was made in the context of a preliminary injunction,[24] defendants have agreed that

21. *See also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359, 364 (3d Cir.1999) (recognizing that, in *Lukumi,* the Supreme Court applied "its religious exemption jurisprudence ... outside the unemployment compensation context").

22. *Cf. Lukumi,* 508 U.S. at 546–47, 113 S.Ct. 2217 (first assuming that the governmental interests were compelling, but holding that the ordinances were not drawn in narrow terms to accomplish those interests; but then concluding that, "in the context of [those] ordinances," the interests were not compelling).

23. The court notes that, at the time of the Preliminary Injunction Ruling, "[t]here appear[ed] to be no dispute that local governments have a compelling interest in protect-

ing the health and safety of their communities through the enforcement of local zoning regulations." 148 F.Supp.2d at 190. There appears to be a dispute now. Plaintiffs have demonstrated the under-inclusiveness of the Order (because the Order does not prohibit plaintiffs from having 24 non-family visitors, each with his or her own vehicle, plus additional family members, with additional vehicles), and under-inclusiveness is demonstrative of an absence of a compelling interest, *see Lukumi,* 508 U.S. at 547–48, 113 S.Ct. 2217. However, the court need not reach that issue, and will assume that defendants' interests in health, safety, and traffic are compelling under the facts of this case.

24. It was also in the context of interpreting RLUIPA's requirements, but those require-

the only evidence necessary for the court's summary judgment decision is that which can be found in the record from the preliminary injunction hearing, the court's statements of fact in its rulings, and certain discovery responses. [Def.s' Mem. in Support of Mot. Summ. J. (doc. # 77) at p. 5.] Defendants have directed the court to no new evidence that would compel the court to revisit its original conclusion.

As noted in the Preliminary Injunction Ruling, the Cease and Desist Order based on the NMZC Opinion was not narrowly tailored in pursuit of defendants' stated interests. [Prelim. Inj. Ruling, 148 F.Supp.2d at 190.] Although defendants' primary concern with plaintiffs' activities was the increased level of traffic on the street, and the safety issues inherent in an increased volume of traffic, defendants' actions did not address the amount of traffic generated by the participants in the prayer group meetings. Rather, the Cease and Desist Order (as well as the NMZC Opinion) regulates only the *number of people* allowed to be present in plaintiffs' home on Sunday afternoons. This is not even a rational restriction, let alone a narrowly-tailored one. [*See id.* (noting the potential irrational application of the Order).] *See also Lukumi*, 508 U.S. at 546, 113 S.Ct. 2217 (noting that over-breadth and under-inclusiveness required finding that means were not narrowly tailored). Moreover, defendants have directed the court to no evidence showing that a limitation on off-street parking is narrowly-tailored (or even rationally related) to the neighbors' concerns about *on-street* parking.

Because defendants have not justified, under the relevant standard, the burdens imposed upon plaintiffs' exercise of their religion, plaintiffs' amended motion for summary judgment on count four is grant-ed, and defendants' parallel motion for summary judgment is denied.

### 5. *Due Process*

■ Plaintiffs argue that defendants' actions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. [*See* Pl.'s Am. Mem. in Support of Summ. J. at pp. 14–16.] Specifically, plaintiffs argue that defendants' zoning regulations are vague, ambiguous, and arbitrary, and defendants' "characterization of the Murphys' get togethers as a 'prayer meeting' is an unlawful *ad hoc* exercise of power." [*Id.*] Defendants respond that "the zoning regulations are neutral as to nature and content of the meetings occurring at the Plaintiffs' home," and that, even if the nature of the meetings is the true target of defendants' actions, those actions bear a rational relationship to a legitimate state purpose. [Def.s' Mem. in Support of Mot. Summ. J. at pp. 12–13.] As neither brief provides a great deal of analysis on these issues, the court has independently reviewed the facts and law to analyze plaintiffs' claim.

■ To meet the constitutional requirement of definiteness, an ordinance must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute," *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954), and must not be so worded as to encourage arbitrary enforcement. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). *See generally Naprstek v. City of Norwich*, 545 F.2d 815, 818 (2d Cir.1976). While the void-for-vagueness doctrine is principally employed in the interpretation and application of criminal statutes, it is also relevant in considering legislation imposing civil sanc-

ments are virtually identical to the Free Exer-cise requirements under strict scrutiny.

tions. *Boutilier v. Immigration and Naturalization Service,* 363 F.2d 488, 495 (2d Cir.1966).

Plaintiffs have not persuaded the court that defendants have violated their Due Process rights. In fact, plaintiffs' argument is somewhat duplicative of—though less detailed than—their First Amendment argument. The facts on which plaintiffs rely to support their argument that "[d]efendants are attempting to use zoning laws to unlawfully restrict private religious speech and free exercise in a private home" are that defendants have "confirmed that the Murphys had obtained proper permits to modify their home as they did" and that "prohibiting the Murphys from praying with friends at their home on Sunday afternoons has no basis in the Town's regulations ..." [*Id.* at p. 15.]

To the extent plaintiffs argue that defendants have violated plaintiffs' Free Exercise rights, which are incorporated into the Due Process Clause of the Fourteenth Amendment, they are correct. [*See, supra,* Section IV.B.4.] [25] To the extent plaintiffs argue that the Cease and Desist Order violates the Due Process Clause because the term "prayer meetings" is vague and ambiguous [*see, e.g.,* Pl.'s Am. Mem. in Support of Summ. J. at p. 16], plaintiffs' motion is denied because, as already noted by the Court, the Cease and Desist Order does not target the content of the speech. Although plaintiffs repeatedly refer to the Cease and Desist Order's prohibition on "prayer meetings," and hypothecate as to which type of meetings would fall under that heading, plaintiffs never produced

any evidence of governmental regulation containing a prohibition on "prayer meetings." While defendants' subjective and individualized assessment of the number of guests permitted in plaintiffs' home substantially burdens plaintiffs' Free Exercise rights without being tailored to any important governmental interest, the prohibition is not centered on whether those meetings constitute "prayer meetings."

The zoning regulations, which prohibit uses not expressly permitted, but which allow accessory uses [*see* Ex. 515], are clearly not facially unconstitutional. Plaintiffs do not claim that the regulations are impermissibly vague in all of their applications. *See Richmond Gun Club v. City of New York,* 97 F.3d 681, 685–86 (2d Cir.1996). Moreover, the regulations are not unconstitutional "as-applied," because the only relevant application is the Cease and Desist Order, which is not impermissibly vague or ambiguous. Indeed, contrary to plaintiffs' assertion that it vaguely prohibits "prayer meetings," the Cease and Desist Order prohibits a specific thing, namely a regular gathering of "a diverse group of people (25 to 40), who are not 'family' as that term is defined in [the zoning] regulations." [Ex. 4.] To the extent plaintiffs ask the court to consider other, as-yet-unenforced interpretations of the zoning regulations, the court declines to do so. *See Richmond Boro Gun Club,* 97 F.3d at 686 (noting the impropriety of considering an as-applied pre-enforcement challenge to an allegedly vague ordinance, based on the doctrine of judicial restraint, which discourages unnecessary, prema-

---

**25.** This ruling holds only that the Cease and Desist Order's limitation on the *number of people* permitted to occupy plaintiffs' home on a regular basis—which is the NMZC's and ZEO's current interpretation of the New Milford Zoning Regulations—violates plaintiffs' Free Exercise rights under the First Amendment, which applies against defendants via the Due Process Clause of the Fourteenth Amendment. The court does not decide whether other limitations, such as parking or traffic ordinances/orders, if constitutional under the First Amendment, would be an arbitrary application of vague or ambiguous zoning regulations in violation of the Fourteenth Amendment.

ture, or unduly broad pronouncements on constitutional issues). The only governmental action at issue here is the issuance of the Cease and Desist Order, and that Order is not so vague and ambiguous as to violate the Fourteenth Amendment.

Plaintiffs have not made a prima facie showing of any independent Due Process violation. Consequently, plaintiffs' amended motion for summary judgment on count five is denied, and defendants' parallel motion for summary judgment is granted, except to the extent plaintiffs' Free Exercise rights are incorporated through the Due Process Clause of the Fourteenth Amendment.

### 6. *Equal Protection*

██ Plaintiffs argue that defendants' selective interpretation and enforcement of the zoning regulation violate plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. [*See* Pl.s' Am. Mem. in Support of Summ. J. at p. 16 ("Equal Protection Clause requires that the government treat equally all persons similarly situated").] Defendants respond that plaintiffs have offered no evidence that similarly situated uses are allowed to exist while plaintiffs' use is unfairly singled out by defendants. [Def.s' Mem. in Support of Summ. J. at p. 13.] Defendants' argument is persuasive.

██ The Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly situated ... be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citation omitted).

In order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show (1) the person, compared with others similarly situated, was selectively treat-

ed; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Lisa's Party City, Inc. v. Town of Henrietta,* 185 F.3d 12, 16 (2d Cir.1999).

The Cease and Desist Order prohibits using plaintiffs' home "as a meeting place by a diverse group of people (25 to 40), who are not 'family' ..., on a regularly scheduled basis ..." [Ex. 4.] Defendants are correct that plaintiffs have not shown that plaintiffs, compared with others similarly situated, were selectively treated. Plaintiffs have directed the court to no evidence showing that regularly scheduled meetings by similarly situated diverse groups of people are permitted.

Plaintiffs argue that "the record reveals that other types of gatherings were previously permitted where the Murphys previously hosted large gatherings without incidence, for example, 100 guests in 1997." [Pl.s' Mem. in Opp. to Def.s' Mot. Summ. J. at p. 16.] Plaintiffs' argument is misplaced. The instance they cite, with no reference to the record, is not an example of a regularly scheduled meeting that would be similarly situated to plaintiffs' prohibited meetings. Moreover, although plaintiffs' counsel asked several questions about hypothetical similarly situated meetings at the Preliminary Injunction Hearing [*see, e.g.,* Tr. 104 ("Are you telling me today that if you found out about regularly-scheduled meetings of any other group, other than the Murphys [...], Boy Scouts, Cub Scouts, Girl Scouts, RCIA, anyone else, you'd go out and investigate it?")], questions are not evidence.

In failing to direct the court to evidence that others similarly situated were treated differently, plaintiffs have failed to estab-

lish the first element of an Equal Protection claim. Accordingly, plaintiffs' amended motion for summary judgment on count six is denied, and defendants' parallel motion for summary judgment is granted.

### 7. *Establishment of Religion*

■ Defendants argue that plaintiffs have abandoned their claim under the Establishment Clause of the First Amendment. The court agrees. First, although plaintiffs assert that "plaintiffs are entitled to summary judgment on each of the claims in Plaintiffs' Amended Complaint except for the Eighth Cause of Action, which the plaintiffs have withdrawn" [Pl.'s Am. Mem. in Support of Summ. J. at p. 1], they fail to address the Seventh Cause of Action in their brief. Furthermore, in their opposition to defendants' motion for summary judgment, plaintiffs "incorporate[ ] by reference" their "arguments regarding the establishment of religion asserted in *Plaintiffs' Amended Memorandum in Support of Motion for Summary Judgment,* although that issue appears nowhere in plaintiffs' Amended Memorandum."[26] Defendants' motion for summary judgment on count seven is therefore granted for the reasons set forth in defendants' opposition to plaintiffs' motion for summary judgment, and plaintiffs' motion for summary judgment is denied.

Moreover, the record of this case does not support plaintiffs' unsupported claim that the Cease and Desist Order constitutes the impermissible establishment of religion. Rather, this is a free exercise case. As neither party has briefed in any detail the merits of this claim, the court need not consider it further.

### 8. *Connecticut Constitutional Claims*

Plaintiffs admit in their briefs that their claims under the Connecticut Constitution mirror those brought pursuant to the United States Constitution. Plaintiffs do not allege that the Connecticut Constitution affords them any greater rights, and plaintiffs do not brief the state constitutional issues separately. Consequently, the court need not address them separately, and declines to exercise supplemental jurisdiction over these claims.

### 9. *RLUIPA*

■ Plaintiffs argue that defendants' actions violate RLUIPA. The court has already held, in the Preliminary Injunction Ruling, that plaintiffs were likely to prevail on the merits of this claim. [Prelim. Inj. Ruling, 148 F.Supp.2d at 191.] Specifically, noting that defendants failed to make a showing that their actions were the least restrictive means of fulfilling a governmental interest, the court held that, "absent some valid argument to the contrary," the plaintiffs were likely to prevail on their RLUIPA claim. [*Id.*]

Defendants agree that the only evidence necessary for the court's summary judgment decision is that which can be found in the record from the preliminary injunction hearing, the court's statement of fact in its rulings, and certain discovery responses. [*See* Def.s' Mem. in Support of Mot. Summ. J. (doc. # 77) at p. 5.] Defendants have directed the court to no new evidence, and have provided the court with no "valid argument to the contrary."

Summary judgment for plaintiffs is warranted under the facts of this case. The "[g]eneral rule" of RLUIPA is that:

---

**26.** The paragraph following the attempted incorporation provides no substance or analy- sis.

[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C § 2000cc(a)(1). RLUIPA further provides, in relevant part, that the statute applies in any case in which the "substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2). RLUIPA provides a cause of action, and also provides that:

[i]f a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law

... or government practice ... substantially burdens the plaintiff's exercise of religion.

42 U.S.C. § 2000cc–2(a), (b).

The court has already found that defendants' actions violate the Free Exercise Clause, because the Cease and Desist Order is a non-neutral, individualized governmental prohibition that substantially burdens plaintiffs' Free Exercise rights without being narrowly tailored to achieve any compelling governmental interest. [*See, supra,* Section IV.B.4.] Because the elements of a RLUIPA claim are virtually identical to a Free Exercise claim, *compare* 42 U.S.C. § 2000c(a)(1),(2)(C) *with Lukumi,* 508 U.S. at 546, 113 S.Ct. 2217, the court holds, based on the reasoning already articulated, that plaintiffs are entitled to summary judgment on their RLUIPA claim.[27] The court finds that turning people away from the Sunday meetings would constitute a substantial burden to plaintiffs' exercise of their religion, and that, even assuming the existence of a compelling governmental interest, defendants have not met their burden of showing that the Cease and Desist Order was narrowly tailored to advance that interest [*see, supra,* Section IV.B.4].[28]

Defendants have failed to adequately rebut[29] plaintiffs' showing that limiting the

---

**27.** The court need not decide whether the elements of a RLUIPA claim and Free Exercise claim are the same, despite minor differences in wording. In this case, the minor differences do not warrant a different conclusion.

**28.** This holding is based, in part, on the findings made in the Preliminary Injunction Ruling. Given the similar standards for RLUIPA and Free Exercise claims, and that the evidence before the court now is virtually identical to the evidence before the court at the time of the Preliminary Injunction Ruling, it is logical that one finding justifies the other.

**29.** In their motion for summary judgment, defendants' primary, if not sole, argument on this issue is that defendants' actions have not imposed a "substantial burden" on plaintiffs. [*See* Def.s' Mem. in Support of Mot. Summ. J. at p. 23]; *see also id.* at p. 24 (application of the zoning regulations "causes at best an inconvenience to the Plaintiffs"). This argument is not persuasive. The court has heard testimony and received affidavits by plaintiffs. There is undisputed evidence that weekly prayer group meetings play an important part in plaintiffs' faith, and that the number of attendees dropped as a result of the issuance of the Cease and Desist Order [*see, supra,* Fact ¶¶ 11, 12]. Defendants direct the court to no

number of people at their meetings substantially burdens the free exercise of their religion. Defendants have not even attempted to show that this particular implementation of the land use regulations—the Cease and Desist Order—is the least restrictive means of furthering any compelling governmental interest. Therefore, with respect to plaintiffs' RLUIPA claim, plaintiffs' amended motion for summary judgment is granted, and defendants' motion for summary judgment is denied.

### 10. *ACRF*

■ Plaintiffs' final claim is that defendants' actions violate Connecticut's ACRF. That statute provides, in its entirety:

§ 52–571b. Action or defense authorized when state or political subdivision burdens a person's exercise of religion (a) The state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the constitution of the state even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
(b) The state or any political subdivision of the state may burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest, and (2) is the least restrictive means of furthering that compelling governmental interest.
(c) A person whose exercise of religion has been burdened in violation of the provisions of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against the state or any political subdivision of the state.

(d) Nothing in this section shall be construed to authorize the state or any political subdivision of the state to burden any religious belief.

(e) Nothing in this section shall be construed to affect, interpret or in any way address that portion of article seventh of the constitution of the state that prohibits any law giving a preference to any religious society or denomination in the state. The granting of government funding, benefits or exemptions, to the extent permissible under the constitution of the state, shall not constitute a violation of this section. As used in this subsection, the term "granting" does not include the denial of government funding, benefits or exemptions.

(f) For the purposes of this section, "state or any political subdivision of the state" includes any agency, board, commission, department, officer or employee of the state or any political subdivision of the state, and "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

Conn. Gen.Stat. § 52–571b.

That statute is modeled after RFRA, which the Supreme Court has held to be unconstitutional as applied against the States, *Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624, but which courts continue to apply against the federal government, *see, e.g., Adams v. C.I.R.,* 170 F.3d 173, 175 n. 1 (3d Cir.1999) ("In general, courts that have addressed the question of constitutionality have found that RFRA is constitutional as applied to the federal government"). Indisputably, ACRF (like RFRA) covers more conduct than RLUIPA; certainly, defendants' conduct in this

---

evidence tending to show that this limitation on plaintiffs' ability to practice their faith is a mere "inconvenience" rather than a "substantial burden." Accordingly, there is no

material dispute that plaintiffs' free exercise of religion is substantially burdened by enforcement of the Cease and Desist Order.

case is covered. ACRF literally requires only a "burden," rather than a "substantial burden," and, like RLUIPA, requires that any such burden further a compelling governmental interest by the least restrictive means. Although defendants' sole argument is that the Cease and Desist Order imposes no burden [*see* Def.'s Mem. in Support of Mot. Summ. J. (doc. # 77) at p. 24; Def.s' Mem. in Support of Obj. to Pl.'s Mot. Summ. J. (doc. # 90) at pp. 3–5], defendants have directed the court to no evidence in the record supporting that position. [*See, supra,* note 29.] Accordingly, for the reasons already stated in the court's discussion of the Free Exercise Clause and RLUIPA, plaintiffs' amended motion for summary judgment on the ACRF claim is granted, and defendants' motion is denied.

## C. *Defendants' Affirmative Defenses*

Defendants argue three affirmative defenses. First, defendants argue that RLUIPA is unconstitutional for three reasons: (a) Congress exceeded its "enforcement power" under § 5 of the Fourteenth Amendment; (b) Congress exceeded its power under the Commerce Clause; and (c) RLUIPA violates the Establishment Clause of the First Amendment. Second, defendants argue that Connecticut's ACRF violates the Establishment Clause of the United States Constitution. Third, defendants argue that Connecticut's ACRF violates the Connecticut Constitution for two reasons: (a) it violates the "separation of powers" doctrine; and (b) it violates the establishment clause of the Connecticut Constitution.

In light of the court's holding that plaintiffs are entitled to summary judgment on their RLUIPA claim, the court must reach the issue of that statute's constitutionality. *See Slack v. McDaniel,* 529 U.S. 473, 485, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)

(noting that constitutional questions should be addressed only if there is no other ground upon which the case may be decided) (relying on *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936)) (Brandeis, J., concurring).

### 1. *The Constitutionality of RLUIPA*

The primary guideposts for this decision are the Supreme Court's decision in *Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624—in which the Court held that RFRA, the predecessor statute to RLUIPA, was unconstitutional because it exceeded Congress' power under section 5 of the Fourteenth Amendment—and *Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876, in which the Court established the standard for Free Exercise cases that RFRA attempted to modify. Also important is the Supreme Court's intervening decision in *Lukumi,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472.

In *Smith,* the plaintiffs had been fired by a private drug rehabilitation organization because they ingested peyote, a hallucinogenic drug, for sacramental purposes at a religious ceremony. Their applications for unemployment compensation were denied by the State of Oregon under a state law disqualifying employees discharged for work-related "misconduct." The question was whether the denial of unemployment compensation violated the plaintiffs' rights under the Free Exercise Clause. The Supreme Court held, essentially, that neutral and generally applicable laws that have the incidental effect of burdening the free exercise of religion need not be supported by a compelling governmental interest. *Smith,* 494 U.S. at 878, 883–86, 110 S.Ct. 1595. In doing so, the court held that the test set forth in *Sherbert,* 374 U.S. 398, 402–03, 83 S.Ct. 1790, 10 L.Ed.2d 965 (pursuant to which govern-

mental actions that substantially burden a religious practice must be justified by a compelling governmental interest), did not apply to neutral and generally applicable laws, because *Sherbert* applied only with respect to individualized governmental assessments. *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595.

Shortly thereafter, the Court confirmed that *Smith* stood for the proposition that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice," *Lukumi,* 508 U.S. at 531, 113 S.Ct. 2217 (citing *Smith*), and that a law burdening religious practice that is not neutral or not of general application must undergo the most rigorous scrutiny—it must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest, *id.* at 531–32, 546, 113 S.Ct. 2217.

"Congress enacted RFRA in direct response to the Court's decision in [*Smith*]." *Flores,* 521 U.S. at 512, 117 S.Ct. 2157. In enacting RFRA, Congress attempted to overrule the Supreme Court's decision in *Smith* and institute a "compelling interest" standard with respect to *all* claims that substantially burdened a person's exercise of religion, even if the burden results from a rule of general applicability. *Flores,* 521 U.S. at 515, 117 S.Ct. 2157. RFRA's stated purpose was to overrule *Smith* and restore the compelling interest test as set forth in *Sherbert,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *Flores,* 521 U.S. at 515–16, 117 S.Ct. 2157 (quoting RFRA).

In *Flores,* the Court ruled that RFRA was unconstitutional. In enacting RFRA, Congress relied on its Fourteenth Amendment enforcement power. *Id.* at 516, 117 S.Ct. 2157. The Fourteenth Amendment provides, in relevant part:

Section 1 ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

\* \* \* \* \* \*

Section 5. The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV. In *Flores,* the Supreme Court acknowledged that § 5 is "a positive grant of legislative power to Congress," and that "[l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into legislative spheres of autonomy previously reserved to the States," but also recognized that "[a]s broad as the congressional enforcement power is, it is not unlimited." *Flores,* 521 U.S. at 517–18, 117 S.Ct. 2157 (citations and internal quotations omitted). Because this "remedial" power cannot alter the meaning of a constitutional provision, as interpreted by the Supreme Court, legislation must be congruent and proportional to the injury to be prevented or remedied and the means adopted to that end. *Id.* at 519–520, 117 S.Ct. 2157. Congress' § 5 power is "corrective or preventive, not definitional," and not "substantive." *Id.* at 525, 527, 117 S.Ct. 2157. Because RFRA was "so out of proportion to a supposed remedial or preventive object," it could not be considered "remedial, preventive legislation." *Id.* at 532, 117 S.Ct. 2157. In other words, because RFRA was so inconsistent with the Supreme Court's interpretation of the Four-

teenth Amendment in *Smith,* Congress exceeded its § 5 enforcement power, intruding on the province of the Supreme Court to determine what the law is, and thus violating the separation of powers doctrine. *Flores,* 521 U.S. at 536, 117 S.Ct. 2157.

Three years after the Supreme Court's decision in *Flores,* after holding nine separate hearings, Congress enacted RLUIPA. Defendants argue that RLUIPA is unconstitutional for many of the same reasons as RFRA. Plaintiffs, as well as the United States (as intervenor) and The Becket Fund (as amicus curiae), argue that RLUIPA is constitutional. Although RLUIPA addresses what Congress determined to be two areas in which the actions of state and local governments impose substantial burdens on the free exercise of religion—state and local land use regulation, and restrictions on institutionalized persons in the custody of states and localities—only the land use provisions are at issue in this case. This decision does not address the constitutionality of the "institutionalized persons" provisions.

a. *Congress' Power under the Fourteenth Amendment*

The primary constitutional issue regarding RLUIPA is whether, by its passage, Congress exceeded its enforcement power

under § 5 of the Fourteenth Amendment. This was the ground upon which the Supreme Court struck down RFRA, and it is the ground most thoroughly addressed by both parties, as well as by the United States (as intervenor) and The Becket Fund (as amicus curiae). Although defendants often refer to the improper regulation of "a traditional arena of local control," principles of federalism, the Tenth Amendment,[30] and the separation of powers, the central issue, which necessarily addresses all of these concerns, is whether Congress exceeded its § 5 enforcement power.

Essentially, defendants argue that RLUIPA suffers the same flaws as its predecessor, RFRA, in that Congress had no evidence of "widespread and persisting" constitutional violations in the land use context, and that, in any event, RLUIPA is not a "congruent and proportional" remedy to any such violations. [Def.s' Mem. in Support of Mot. Summ. J. at p. 30.]

██ Because "Congress' § 5 authority is appropriately exercised only in response to state transgressions," the first issue a court must address is "whether Congress identified a history and pattern of unconstitutional [conduct]." *Board of Trustees of University of Alabama v. Garrett,* 531 U.S. 356, 368, 121 S.Ct. 955, 148 L.Ed.2d

---

**30.** *Cf. Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) ("the Eleventh Amendment, and the principle of state sovereignty which it embodies ..., are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment. In that section Congress is expressly granted authority to enforce 'by appropriate legislation' the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority. When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose

other sections by their own terms embody limitations on state authority.") *See also Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 80, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) ("Section 5 of the Fourteenth Amendment ... does grant Congress the authority to abrogate the States' sovereign immunity"). Thus, in deciding that RLUIPA is "appropriate legislation" under § 5 of the Fourteenth Amendment, the court is necessarily deciding that such legislation does not violate the Tenth Amendment. *See also New York Gaslight Club, Inc. v. Carey,* 447 U.S. 54, 67, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980) (relying on *Fitzpatrick* in rejecting a similar "Tenth Amendment argument").

866 (2001). *See also CSX Transp., Inc. v. New York State Office of Real Property Services*, 306 F.3d 87, 96–97 (2d Cir.2002) ("Determining whether Congress properly exercised its powers under Section 5 of the Fourteenth Amendment ... requires a two-part test. First, we ask whether Congress identified a history and pattern of unconstitutional [conduct]... Second, we ask whether the legislation under question passes the 'congruence and proportionality' test.")

As a preliminary matter, it is important to note that congressional findings are "not determinative of the § 5 inquiry," *Kimel*, 528 U.S. at 91, 120 S.Ct. 631, and the need for such findings is diminished where "the Act prohibits very little constitutional conduct," *Nanda v. Board of Trustees of the University of Illinois*, 303 F.3d 817, 828–29 (7th Cir.2002) (citing *Kimel*, 528 U.S. at 91, 120 S.Ct. 631). In any event, the legislative history reveals that, after holding nine (9) hearings over three (3) years, Congress "compiled massive evidence that this right [of religious communities to assemble] is frequently violated," 146 Cong. Rec. S7774 (daily ed. July 27, 2000) (joint statements of Sen. Hatch and Sen. Kennedy). The congressional record includes findings that land-use laws are commonly enacted and enforced out of hostility to religion. *See* 146 Cong. Rec. S7774 ("Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes"); 146 Cong. Rec. S7774 ("Sometimes, zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church, especially in cases of black Churches and Jewish shuls and synagogues[; m]ore often,

discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan' "). Congress found that discriminatory *application* of zoning laws is particularly common because, as in this case, zoning laws across the country are overwhelmingly discretionary [31] and subjective. *See* 146 Cong. Rec. S7775 (daily ed. July 27, 2000) ("The hearing record demonstrates a widespread practice of individualized decisions to grant or refuse permission to use property for religious purposes[; t]hese individualized assessments readily lend themselves to discrimination, and they also make it difficult to prove discrimination in any individual case"); H.R.Rep. No. 106–219, at 17 ("Local land-use regulation, which lacks objective, generally applicable standards, and instead relies on discretionary individualized determinations, presents a problem that Congress has closely scrutinized and found to warrant remedial measures under its section 5 authority").

When Congress makes findings on essentially factual issues, those findings are "entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue." *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 331 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985) (collecting cases). Granting Congress the deference it deserves, the court finds that Congress adequately identified a history and pattern of unconstitutional conduct that needed to be addressed.

The court next must decide whether Congress' action was a "congruent and proportional" means for preventing or deterring the constitutional injuries identi-

---

**31.** In other words, the "generally applicable" laws described in *Smith* are uncommon in the land-use context.

fied. Because this inquiry is necessarily related to the distance, if any, Congress has strayed from established jurisprudence, the court must first compare RLUIPA to the current case law.

Subsections (a)(1) (requiring the application of strict scrutiny) and (a)(2)(C) (the "individualized assessments") provision—the subsections relevant to this case—are essentially codifications of Supreme Court jurisprudence. The court takes them in reverse order.

"What Congress manifestly has done in [subsection (a)(2)(c) ] is to codify the individualized assessments jurisprudence in Free Exercise cases that originated with the Supreme Court's decision in [*Sherbert*, 374 U.S. 398, 83 S.Ct. 1790]." *Freedom Baptist Church*, 204 F.Supp.2d at 868. In *Lukumi*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472, decided after *Smith*, the Supreme Court confirmed the importance of the "individualized assessments" distinction and applied that distinction outside the unemployment compensation arena. *See generally Freedom Baptist Church*, 204 F.Supp.2d at 868–69. Reading the relevant provisions of RLUIPA in light of *Lukumi* and other decisions, this court agrees with the *Freedom Baptist Church* court that it is "apparent that subsection (a)(2)(C) faithfully codifies the 'individual assessments' jurisprudence in the *Sherbert* through *Lukumi* line of cases." 204 F.Supp.2d at 869. *See also Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1221 (C.D.Cal.2002) ("To the extent that RLUIPA is enacted under the Enforcement Clause, it merely codifies numerous precedents holding that systems of individualized assessments, as opposed to generally applicable laws, are subject to strict scrutiny") (citing *Freedom Baptist Church*, 204 F.Supp.2d at 868; *Lukumi*, 508 U.S. at 537–38, 113 S.Ct. 2217; *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir.1999)).[32] *But see Elsinore Christian Center v. City of Elsinore*, 270 F.Supp.2d 1163 (C.D.Cal. 2003) (holding that the "individualized assessments" portion of RLUIPA is unconstitutional as it exceeds Congress's power under § 5 of the Fourteenth Amendment).

Were it not for subsection (a)(2)(C), subsection (a)(1) might be unconstitutional. Perhaps the greatest constitutional flaw in RFRA was that Congress attempted to apply strict scrutiny to all religious burdens despite the Supreme Court's recent holding in *Smith* that strict scrutiny did not apply to neutral, generally applicable laws. *See Flores*, 521 U.S. at 533–535, 117 S.Ct. 2157. However, subsection (a)(2)(c) limits subsection (a)(1)'s "compelling interest"/"least restrictive means" standard to cases involving "individualized assessments"—a limitation implicitly approved in *Smith* and explicitly confirmed in *Lukumi*. RLUIPA is therefore not hostile to *Smith, Lukumi*, or *Flores*, and in fact represents a fair amalgamation of those decisions. Clearly, unlike RFRA, RLUIPA does not "attempt a substantive change in constitutional protections." *Flores*, 521 U.S. at 532, 117 S.Ct. 2157.

Determining exactly how closely RLUIPA tracks Supreme Court jurisprudence would involve a series of hypothetical questions that the court need not, and

---

**32.** In *Cottonwood*, the constitutionality of RLUIPA was not specifically attacked by any party. The court simply noted that, "[b]ecause RLUIPA is based on ... the codification of current precedent on individualized assessments, ... RLUIPA would appear to have avoided the flaws of its predecessor RFRA, and be within Congress's constitutional authority." 218 F.Supp.2d at 1221 n. 7 (citing *Freedom Baptist Church*, 204 F.Supp.2d at 863).

should not, answer.[33] Defendants argue that RLUIPA dramatically changes the legal landscape. The primary argument of plaintiffs, the government, and The Becket Fund is that RLUIPA simply codifies Supreme Court jurisprudence (although they argue, in the alternative, that, to the extent RLUIPA provides greater protection, that broader protection is constitutional). The *Freedom Baptist Church* court considered RLUIPA "something new under the federalism sun," 204 F.Supp.2d at 871–72, but ultimately concluded that, although RLUIPA "places a statutory thumb on the side of religious free exercise in zoning cases," it is "narrowly drawn" and does not "unduly offend[ ] the federal structure," *id.* at 874.

This court agrees, in substance, with the *Freedom Baptist Church* court that RLUIPA does not simply "restate [42 U.S.C.] § 1983," *id.* at 874, but would not characterize RLUIPA as something entirely "new under the federalism sun." The statute so closely tracks *Lukumi* that this court regards RLUIPA as something in the nature of "*Lukumi*-plus" protection.

■ Having compared RLUIPA to established jurisprudence, the court turns back to the "congruent and proportional" test. The court agrees with The Becket Fund [*see* Brief Amicus Curiae at p. 15] that "[t]he prohibitions of RLUIPA based on the Enforcement Clause correspond so closely to current First and Fourteenth Amendment jurisprudence that they scarcely require justification as 'preventive' or 'deterrent' measures that trigger the congruence/proportionality inquiry under *Flores*." Yet, the court assumes, for the sake of this ruling, that RLUIPA's "*Lukumi*-plus" scope may cover some conduct not covered by the Fourteenth

Amendment itself. This is not impermissible. As the government notes in its brief [Intervenor's Mem. at p. 16], the Supreme Court has long recognized that "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violations of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel,* 528 U.S. at 81, 120 S.Ct. 631. *See also Florida Prepaid v. College Savings Bank,* 527 U.S. 627, 639, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999); *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn,* 280 F.3d 98, 108 (2d Cir.2001).

The court finds that, to the extent RLUIPA extends slightly beyond the proscriptions of § 1 of the Fourteenth Amendment, it is acceptable as a prophylactic rule. This is particularly true when Congress designs legislation to ensure the full vindication of constitutional rights (for example, by easing difficult proof requirements in order to facilitate enforcement) and incidentally captures some conduct that, although close to the constitutional line, is not itself unconstitutional. Where, as here, § 5 legislation closely tracks constitutional guarantees, any marginal conduct that is covered by the statute, but not the Constitution, "nevertheless constitutes the kind of congruent, and, above all, proportional remedy Congress is empowered to adopt under § 5 of the Fourteenth Amendment." *Freedom Baptist Church,* 204 F.Supp.2d at 874.

In sum, although RFRA and RLUIPA are similar in some respects—i.e., both were designed to strengthen the protection of religious liberty—they are different in all respects relevant to their constitutional-

---

**33.** For example, in this case, defendants' actions violate the Free Exercise Clause and RLUIPA. Whether it is possible to violate RLUIPA and not the Free Exercise Clause the court need not decide.

ity. The crucial difference is the result of a demonstrated effort by Congress to *comply* with the requirements of *Flores*,[34] not, as defendants suggest, to defy it or to usurp judicial authority to define constitutional violations.[35] RLUIPA essentially codifies First and Fourteenth Amendment standards—based on sufficient evidence in the legislative history demonstrating the need for better enforcement of those standards—and institutes proportional remedies. To the extent RLUIPA covers marginally more conduct than the Fourteenth Amendment itself, it does so within acceptable constitutional parameters. Therefore, RLUIPA does not violate § 5 of the Fourteenth Amendment.

### b. *Congress' Power under the Commerce Clause*

Defendants next argue that RLUIPA is unconstitutional because it exceeds Congress' power under the Commerce Clause, U.S. Const. art. I, § 8 ("The Congress shall have the Power . . . To regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes"). Defendants' argument is misplaced, because the provision of RLUIPA enacted pursuant to Congress' authority under the Commerce Clause is not at issue in this case.

Plaintiffs' RLUIPA claim is brought only pursuant to subsection (a)(1) of 42 U.S.C. § 2000cc, which requires that land use regulations that impose substantial burdens on religious exercise be in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest. [*See* Pl.s' Am. Mem. in Support of Summ. J. at p. 19; Pl.s' Mem. in Opp. to Def.s' Mot. Summ. J. at pp. 30–31.] Subsection (a)(2) limits the reach of subsection (a)(1) to situations in which:

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regula-

---

**34.** *See, e.g.*, 146 Cong. Rec. S7775 ("Each subsection closely tracks the legal standards in one or more Supreme Court opinions, codifying those standards for greater visibility and easier enforceability").

**35.** On the contrary, the Court in *Smith* implicitly endorsed a statute—like RLUIPA—that protects somewhat "more" religious exercise than the Free Exercise Clause itself protects. 494 U.S. at 890, 110 S.Ct. 1595 ("Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process[; j]ust as a society that believes in the negative protection accorded to the press by the First Amendment is likely to enact laws that affirmatively foster the dissemination of the printed word, so also a society that believes in the negative protection accorded to religious belief can be ex-pected to be solicitous of that value in its legislation as well"). *Compare also Smith* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (Free Exercise Clause does not prohibit application of Oregon drug laws to ceremonial ingestion of peyote) *with Lee v. Weisman*, 505 U.S. 577, 628–29, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Souter, J., concurring) ("in freeing the Native American Church from federal laws forbidding peyote use, *see* Drug Enforcement Administration Miscellaneous Exemptions, 21 C.F.R. § 1307.31 (1991), the government conveys no endorsement of peyote rituals, the Church, or religion as such; it simply respects the centrality of peyote to the lives of certain Americans"). *See also Smith*, 494 U.S. at 890, 110 S.Ct. 1595 ("a number of States have made an exception to their drug laws for sacramental peyote use").

tion or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2)(A)-(C). As the government notes in its brief, Congress relied on its authority under the Spending Clause in enacting § (a)(2)(A); on its authority under the Commerce Clause for § (a)(2)(B); and on its enforcement power under § 5 of the Fourteenth Amendment in enacting § (a)(2)(C). Because plaintiffs in this lawsuit invoke only the Fourteenth Amendment provision of RLUIPA, the court need not, and consequently must not, decide the constitutionality of RLUIPA's Commerce Clause provisions.

Defendants' motion for summary judgment on this defense is denied as moot.

### c. *The Establishment Clause*

■ Defendants argue that the Establishment Clause of the First Amendment "prohibit[s] RLUIPA's direct handout to religious landowners in the arena of local land use." [Def.s' Mem. in Support of Mot. Summ. J. at p. 44.] Specifically, defendants argue that RLUIPA does not satisfy the traditional test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and that, under *Lee v. Weisman*, 505 U.S. 577, 585, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), RLUIPA is an unlawful endorsement of religion. Defendants have not persuaded the court.

■ The Establishment Clause "prohibits any government from enacting a law that would respect the establishment of religion." *Mayweathers v. Newland*, 314 F.3d 1062, 1068 (9th Cir.2002).

While this clause forbids Congress from advancing religion, the Supreme Court

has interpreted it to allow, and sometimes to require, the accommodation of religious practices: "This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–45, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). Moreover, "in commanding neutrality the Religious Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

*Id.*

Defendants' argument that RLUIPA violates the Establishment Clause echoes Justice Stevens' concurring opinion in *Flores*, in which Justice Stevens opined that RFRA—the predecessor statute to RLUIPA—violated the Establishment Clause. That concurring opinion reads, in its entirety:

In my opinion, the Religious Freedom Restoration Act of 1993 (RFRA) is a "law respecting an establishment of religion" that violates the First Amendment to the Constitution.

If the historic landmark on the hill in Boerne happened to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure. Because the landmark is owned by the Catholic Church, it is claimed that RFRA gives its owner a federal statutory entitlement to an exemption from a generally applicable, neutral civil law. Whether the Church would actually prevail under the

statute or not, the statute has provided the Church with a legal weapon that no atheist or agnostic can obtain. This governmental preference for religion, as opposed to irreligion, is forbidden by the First Amendment. *Wallace v. Jaffree,* 472 U.S. 38, 52–55, 105 S.Ct. 2479, 2487–2489, 86 L.Ed.2d 29 (1985).

*Flores,* 521 U.S. at 536–37, 117 S.Ct. 2157 (Stevens, J., concurring).

That opinion, however, represents the views only of Justice Stevens. At least one court has found that limitation to be highly persuasive that RFRA (a broader statute) does not violate the Establishment Clause. *See Freedom Baptist Church of Delaware County v. Township of Middletown,* 204 F.Supp.2d 857, 864 (E.D.Pa. 2002) ("With all deference to Justice Stevens's views, it has not escaped our attention that his concurrence was only for himself").[36]

The *Freedom Baptist Church* court also relied on post-*Flores* appellate jurisprudence holding that RFRA remains effective as to the federal government. 204 F.Supp.2d at 864 (citing *Kikumura v. Hurley,* 242 F.3d 950, 959–60 (10th Cir. 2001); *Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 833 (9th Cir.1999); *In re Young,* 141 F.3d 854, 861 (8th Cir. 1998)).[37] Those Court of Appeals decisions suggest that Justice Stevens' is a lone opinion because, if RFRA were constitutionally infirm on Establishment Clause grounds as to the states, there would be no principled way to exempt the national gov-

ernment from the same infirmity. *Freedom Baptist Church,* 204 F.Supp.2d at 865. Indeed, the *Freedom Baptist Church* court found it unnecessary to address the three-part *Lemon* test in concluding that RLUIPA does not violate the Establishment Clause.

 A brief examination of the *Lemon* test only solidifies the *Freedom Baptist Church* conclusion. Under *Lemon,* a statute will survive an Establishment Clause attack if (1) it has a secular purpose, (2) its primary effect neither advances nor inhibits religion, and (3) it does not foster excessive government entanglement with religion. *Lemon,* 403 U.S. at 612–613, 91 S.Ct. 2105. RLUIPA satisfies all three tests.

RLUIPA has a secular purpose. The Supreme Court has recognized that "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions"; that it is a "proper [government] purpose [to] lift[ ] a regulation that burdens the exercise of religion; and that the 'purpose of limiting governmental interference with the exercise of religion' is permissible." *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos* ("*Amos*"), 483 U.S. 327, 335, 338, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987). *See also Hsu v. Roslyn Union Free Sch. Dist.,* 85 F.3d 839, 865 (2d Cir.1996) (holding that the removal

---

**36.** That court specifically noted that "neither Justice Kennedy's opinion for the Court, nor Justice Scalia's concurrence (which Justice Stevens joined), nor Justice O'Connor's dissent (much of which Justice Breyer joined), nor Justice Breyer's dissent, mentions a word about the Establishment Clause," and added that "[t]his is particularly notable since (a) Justice Stevens threw the issue into bold relief, and (b) the RFRA was, as all agree, a much broader statute than the RLUIPA."

*Freedom Baptist Church,* 204 F.Supp.2d at 864.

**37.** RFRA continues to be applied against the federal government in this Circuit. *See also Browne v. United States,* 176 F.3d 25, 26 (2d Cir.1999); *Marrero v. Apfel,* 87 F.Supp.2d 340, 348 (S.D.N.Y.2000). These cases did not address the constitutionality of the statute.

of an impediment to religious exercise "serves a secular function"). This was the precise aim of Congress in enacting RLUIPA. *See* 146 Cong. Rec. E1234, E1235 (daily ed. July 14, 2000) (statement of Rep. Canady) (explaining that RLUIPA was "designed to protect the free exercise of religion from unnecessary government interference"). RLUIPA's principal or primary effect neither advances nor inhibits religion. "For a law to have forbidden effects under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Amos*, 483 U.S. at 337, 107 S.Ct. 2862 (emphasis in original). "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose." *Id.* (emphasis in original). Because RLUIPA's effect is the alleviation of unnecessary interference with religious exercise and government-imposed hardships, rather than the promotion of religion, RLUIPA does not impermissible "advance" religion.

Finally, RLUIPA does not foster an excessive government entanglement with religion. This test is often subsumed in the effects test. *See Agostini v. Felton*, 521 U.S. 203, 232, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ("the factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect' "). The factors that show that RLUIPA does not have a constitutionally impermissible effect also suggest that RLUIPA passes the entanglement test. In fact, the purpose and effect of RLUIPA is antithetical to entanglement, because it minimizes government involvement and regulation of religious exercise. As the Supreme Court noted in a similar context, "[i]t cannot be seriously contended that [the statute] impermissibly entangles church and state; the statute effectuates a more complete separation of the two ..." *Amos*, 483 U.S. at 339, 107 S.Ct. 2862.

RLUIPA, therefore, satisfies all of the *Lemon* tests, and does not violate the Establishment Clause. RLUIPA removes barriers to the free exercise of religion— an effect the Supreme Court has repeatedly found to be constitutional, *see, e.g., Board of Education v. Grumet*, 512 U.S. 687, 705, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("we do not deny that the Constitution allows the State to accommodate religious needs by alleviating special burdens[; o]ur cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice"). Despite defendants' argument that RLUIPA impermissibly endorses religion because it singles out religious organizations to the detriment of other organizations [Def.s' Mem. in Support of Mot. Summ. J. at pp. 47–48], the Supreme Court has already held that "[w]here ... government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Amos*, 483 U.S. at 338, 107 S.Ct. 2862. Defendants' motion for summary judgment on this defense is denied, and plaintiffs' amended motion for summary judgment is granted.

2. *Defendants' Argument that Connecticut's ACRF Violates the Establishment Clause of the United States Constitution*

Defendants' argument on this issue reads, in its entirety:

For all those reasons stated in the proceeding [*sic*] section of this brief addressing the constitutionality of the RLUIPA, the Connecticut version of the RFRA is also unconstitutional because it

clearly violates the federal establishment clause.

[Def.s' Mem. in Support of Mot. Summ. J. at p. 53.] Similarly, plaintiffs argue that, "[f]or the very same reasons that RLUIPA is constitutional, espoused previously, Connecticut's RFRA is likewise a permissible accommodation or religious practice—both under the federal and Connecticut constitutions." [Pl.s' Mem. in Opp. to Def.s' Mot. Summ. J. at p. 44.]

▆▆▆ Every state statute is entitled to a "presumption of constitutionality." *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 796, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). *See also Campbell v. Bysiewicz* 213 F.Supp.2d 152, *154 (D.Conn.,2002) ("State statutes validly enacted are presumed constitutional") (citing *United States v. Carolene Prods. Co.,* 304 U.S. 144, 148, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)). Because defendants have set forth no independent reason why Connecticut's ACRF violates the federal Establishment Clause, the court must presume that Connecticut's ACRF is constitutional. [*Cf., supra,* section IV.C.1.c (holding that RLUIPA does not violate the Establishment Clause).]

### 3. *Defendants' arguments under the Connecticut Constitution*

Defendants' final argument is that Connecticut's ACRF violates the Constitution of the State of Connecticut. In the absence of a fully developed record and a good reason to opine on that important state issue, the court declines to assert supplemental jurisdiction over this state law claim.

## V. *APPROPRIATE REMEDIES*

In their complaint, plaintiffs seek the following relief: (a) a permanent injunction restraining defendants' enforcement of the Cease and Desist Order; (b) damages; (c) that the court retain jurisdiction of this matter for the purpose of enforcing its orders; (d) costs and expenses, including a reasonable attorneys' fee award in accordance with 42 U.S.C. § 1988 and other applicable law; (e) a declaratory judgment regarding "the rights and other legal relations of the parties to the subject matter here in controversy" which will "have the force and effect of final judgment"; and (f) other relief that the court deems equitable, just, and proper.

The court has already awarded preliminary injunctive relief on the ground that plaintiffs had shown irreparable harm and likelihood of success on the merits. Having now found that plaintiffs actually succeeded on their constitutional claims, the court will permanently enjoin enforcement of the Cease and Desist order against plaintiffs. Plaintiffs are directed to submit, within fifteen (15) days of the docketing of this ruling, proposed language for the permanent injunction. Defendants will respond within ten (10) days.

Additional proceedings are necessary with respect to plaintiffs' claim for damages. If plaintiffs intend to pursue their claim for damages, upon the filing of a motion for hearing on damages, the court will consult counsel and schedule a hearing.

Plaintiffs will file a motion for an award of costs and attorneys' fees. If a hearing on damages is scheduled, these matters will be heard simultaneously. If not, the court may schedule a hearing on plaintiffs' motion for attorneys' fees or, if appropriate, decide this matter "on the papers."

▆▆▆ In light of the injunctive and other relief sought, a declaratory judgment is unnecessary. It is in the court's discretion whether to grant or withhold declaratory relief. *See A.L. Mechling Barge Lines, Inc. v. U.S.,* 368 U.S. 324, 331, 82 S.Ct.

337, 7 L.Ed.2d 317 (1961) ("Declaratory judgment is a remedy committed to judicial discretion"); *Vandiver v. Transcontinental Gas Pipe Line Corp.*, 222 F.Supp. 731, 733 (M.D.Ga.1963) ("There is a permissible element of judicial discretion in granting or withholding declaratory relief"). Although the existence of another adequate remedy is not an automatic bar to an award of declaratory relief, the court, in the exercise of discretion, can refuse to grant declaratory relief if alternative remedies are better or more effective. *Cartier v. Secretary of State*, 506 F.2d 191, 200 (D.C.Cir.1974). Declaratory relief is typically appropriate to resolve disputes *before* a cause of action accrues. *See American Mail Line, Ltd. v. U.S.*, 213 F.Supp. 152, 160 (W.D.Wash.1962). *See also Tasini v. New York Times Co., Inc.*, 184 F.Supp.2d 350, 356 (S.D.N.Y.2002) ("a declaratory judgment is a device which allows litigants to seek a judicial determination before the complained-of harm has occurred"). In this case, the complained-of harm—the prohibition imposed by the Cease and Desist Order—*has* occurred, and appropriate injunctive relief has been awarded. Accordingly, the court, in its discretion, finds additional declaratory relief unnecessary and declines to award it.

## VI. *SUMMARY*

The Cease and Desist Order issued by the defendant ZEO unconstitutionally abridges plaintiffs' First Amendment rights to freely exercise their religion and peaceably assemble. The Cease and Desist Order also violates plaintiffs' rights under the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA") and Connecticut's Act Concerning Religious Freedom.

RLUIPA violates neither the Establishment Clause of the First Amendment nor the Enforcement Clause of section 5 of the Fourteenth Amendment.

The Cease and Desist Order does not violate plaintiffs' First Amendment right to free speech or right to privacy. Nor does it violate plaintiffs' Fourteenth Amendment rights to due process or equal protection.

Plaintiffs are therefore entitled to a permanent injunction, prohibiting enforcement of the Cease and Desist Order. Further proceedings are necessary to determine the extent to which plaintiffs are entitled to damages and/or attorneys' fees.

## VII. *CONCLUSION*

Plaintiffs' amended motion for summary judgment [**doc. # 83**] is **GRANTED IN PART and DENIED IN PART**, and plaintiffs' original motion for summary judgment [**doc. # 73**] (which was superseded by their amended motion) is **DENIED AS MOOT**. Defendants' motion for summary judgment [**doc. # 76**] is **GRANTED IN PART** and **DENIED IN PART**.

This is not a recommended ruling. The parties consented to proceed before a United States Magistrate Judge [doc. # 20] on January 10, 2001, with appeal to the Court of Appeals.